Alison Berry Wilkinson (SBN 135890)
Berry | Wilkinson | Law Group
165 North Redwood Drive, Suite 206
San Rafael, California
Telephone:    (415) 259.6638
Facsimile:    (877) 259.3762
Email: alison@berrywilkinson.com

Attorneys for Defendant
JOHN  WHITNEY

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| RYAN MCMAHON, an individual,<br><br>                         Plaintiff,<br><br>         vs.<br><br>JOHN WHITNEY, SHANE BOWER, CITY OF VALLEJO, and DOES 1-10, inclusive<br><br>                         Defendants. | Case No. 2:23-cv-01972-KJM-JDP<br><br>DECLARATION OF ALISON BERRY WILKINSON IN OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY<br><br>Date:          February 16, 2024<br>Time:          10:00 a.m.<br>Courtroom:  3, 15th Floor<br>Judge:        Hon. Kimberly J. Mueller |

I, Alison Berry Wilkinson, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and am admitted to the United States District Courts for the Northern, Eastern, and Central Districts of California, the Ninth Circuit, and the United States Supreme Court.  I am the attorney of record for Defendant JOHN WHITNEY herein.

2.      I make this declaration based on my own personal knowledge and, if called to testify, could and would testify competently to the matters contained herein.

3.      This declaration is submitted in response to the Plaintiff's Motion to Disqualify as well as the  supporting declarations submitted by Plaintiff and his counsel. (Docket Nos. 228, 8-1 and 28-2.)

4.      Prior to preparing this declaration, I researched what information I could present in response to the declarations and motions filed at Docket No. 28, as I was concerned with whether I

1

1    would violate the attorney-client privilege or other ethical duties if I referenced the materials from my

2    files that rebut the incorrect and misleading statements made in the motion.  From that research, I

3    learned that I am permitted to present the information included herein because Mr. McMAHON has

4    accused me of violating my responsibilities as an attorney.  If the court requests, I would be happy to

5    provide the research in support of that understanding.

6        5.      To make evaluation of the information in this declaration easier, this declaration has

7    been divided into the following sections:

TABLE OF CONTENTS

A.    PRIOR REPRESENTATION OF RYAN MCMAHON ...................................................2

B.    THE TWO COMMUNICATIONS WITH RYAN MCMAHON AFTER 2016 ............11

    (1)    THE SEPTEMBER 24, 2023 PHONE CALL ......................................................12

    (2)    THE JULY 16, 2020 TELEPHONE CALL...........................................................15

C.    COMMUNICATIONS WITH McMAHON'S COUNSEL...........................................19

    (1)    COMMUNICATION WITH McMAHON ATTORNEY DALE ALLEN ON
           JULY 29, 2020 ......................................................................................................19

    (2)    COMMUNICATIONS WITH McMAHON ATTORNEY JUSTIN
           BUFFINGTON FROM AUGUST to DECEMBER 2020...................................20

D.    COMMUNICATIONS WITH THE BROADMOOR POA ............................................22

E.    THE ALLEGED "KRON 4" CHRISTMAS EVE NEWS BROADCAST ....................24

F.    THE POSTING OF WHITNEY'S HOME ADDRESS ON THE PACER WEBSITE...24

G.    THE COMMUNICATIONS ABOUT DISQUALIFICATION.......................................27

H.    THE PREJUDICE TO DEFENDANT WHITNEY .......................................................28

**A.    PRIOR REPRESENTATION OF RYAN MCMAHON**

23        6.      I have been an authorized panel attorney for the Legal Defense Fund of the Peace

24   Officers Research Association of California (hereafter "PORAC LDF") since 1988.  Information about

25   PORAC LDF and its representation plans can be found at: www.poracldf.org

26        7.      In my role as an authorized PORAC LDF panel attorney, I receive assignments to

27   represent individual public safety employees whose unions subscribe to the program.

---

DECL OF ALISON BERRY WILKINSON IN OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY
*McMahon v. Whitney, Case No. 2:23-cv-01972-KJM-JDP*

8.      I am a designated PORAC LDF panel attorney for a variety of public safety unions throughout Northern California, including, but not limited to the jurisdictions where Plaintiff RYAN McMAHON (hereafter "McMAHON") and Defendant JOHN WHITNEY worked, specifically: the Sausalito Police Association, the Central Marin Police Association, and the El Cerrito Police Employees' Association.

9.      Although at various times in my career I have served as an authorized PORAC LDF Panel Attorney for the Vallejo Police Officers' Association, I have not done so since before February 2008. Since 2008, I have occasionally been hired directly by Vallejo police employees who are either not covered by PORAC LDF or wish to use counsel different from the union-designated law firms.

10.      While McMAHON was employed at the Sausalito and Central Marin Police Departments, I was (and remain today) one of the authorized PORAC LDF panel providers for matters arising at those agencies. Once McMAHON left the Central Marin Police Department for the Vallejo Police Department, I was no longer an authorized attorney for him, nor was I engaged or requested to represent him in any matter. I provided no legal services to McMAHON after 2016.

11.      I began representing Defendant JOHN WHITNEY in 2019 in connection with the events leading to his summary discharge from the Vallejo Police Department, and his claims of whistleblower status. While representing WHITNEY, attorneys for McMAHON contacted me to obtain information in WHITNEY's possession related to McMAHON and the legal troubles those counsel were handling. As described in Section C, *infra*, I did serve as a resource to those attorneys and assisted in providing information in the possession of my client, JOHN WHITNEY that might assist their client, RYAN McMAHON. I did not provide representation directly to McMAHON, nor did I enter into an attorney-client relationship with him after June 24, 2016.

12.      In the declaration McMAHON filed in support of the Motion to Disqualify, McMAHON accurately indicated that I "was hired to represent [him] in [his] duties as a police officer on multiple occasions." (Docket No. 28-1 at ¶4.) My file records confirm that statement, revealing that from 2012-2015, PORAC LDF assigned me to represent McMAHON in four (4) matters: Case Nos. 12-1685, 14-0485, 15-1505, and 15-3187. Three (3) of those matters involved McMAHON's employment at the Sausalito Police Department, and one (1) involved his employment at the Central Marin Police

1   Department.

2        13.      PORAC LDF Case No. 12-1685 involved allegations of off-duty misconduct while

3   Plaintiff was employed at the Sausalito Police Department.  That matter resolved without disciplinary

4   action and was closed on October 4, 2013. A true and correct copy of the PORAC LDF Closed Case

5   File Report can be found in **Exhibit B** at pages 3-4.

6        14.      PORAC LDF Case No. 14-0485 involved allegations of disrespectful conduct to a

7   member of the public while Plaintiff was employed at the Sausalito Police Department.  That matter

8   was closed on December 23, 2014 because McMAHON was simply a witness to the incident and not a

9   subject of the allegations.  As a witness, McMAHON was not entitled to legal representation under

10  either the PORAC LDF Plan Document or the Public Safety Officers' Procedural Bill of Rights Act,

11  Government Code section 3300 *et seq.* A true and correct copy of the PORAC LDF Closed Case File

12  Report can be found in **Exhibit B** at pages 5-6.

13       15.      PORAC LDF Case No. 15-1505 involved allegations of discourtesy to the public and

14  conduct unbecoming while Plaintiff was employed at the Sausalito Police Department.  That matter

15  resolved with no discipline or misconduct findings and was closed on December 30, 2015.  A true and

16  correct copy of the PORAC LDF Closed Case File Report can be found in **Exhibit B** at pages 8-10.

17       16.      PORAC LDF Case No. 15-3187 involved an allegation of disrespectful treatment of the

18  pubic and an alleged unreasonable use of force.  That matter resolved with an "exonerated" finding and

19  was closed on June 24, 2016. A true and correct copy of the PORAC LDF Closed Case File Report can

20  be found in **Exhibit B** at pages 11-13.

21       17.      On June 24, 2016, I sent McMAHON a closing representation letter, which stated:

22             As the matter has now concluded and no further representation is
23             required, I am closing your case with both the PORAC Legal Defense
               Fund and this office.
24
25  Such letters are regularly issued by my office upon the closing of the file and for efficiency follow a

26  standard template.  The purpose of the letter is to document that the representation has ended and to

27  ensure the client knows that no further action will be taken on his/her/their behalf.  True and correct

28

4

copies of the letter I sent to McMAHON on June 24, 2016, as well as the closing status report submitted to PORAC LDF that same day, are attached hereto as **Exhibit A**.

18.     Absent a signed written authorization from McMAHON or a court order, I am unable to provide further details related to the PORAC LDF matters I handled other than that they involved his duties at those law enforcement organizations that are not related to any of the events about which he complains in the original complaint filed (Docket No. 1) or the proposed amended complaint (Docket No. 24). Suffice it to say, that nothing in either of those complaints suggests that McMAHON's performance or personnel records from any prior agencies are at issue.  If ordered by the Court, I can and will produce my electronically maintained files related to those representations to the Court for inspection and evaluation.

19.     Read in its totality, the declaration submitted by McMAHON appears to claim that he believed I remained his attorney after he transferred to the Vallejo Police Department from the Central Marin Police Department.  In my research, I learned that an inaccurate statement, voluntarily made to third parties, concerning a privileged communication waives the privilege with respect to that communication.  Consequently, I submit the following in response to demonstrate that McMAHON could not reasonably have believed I was his attorney after he left Central Marin for the Vallejo Police Department:

a. McMAHON was aware that I would no longer be his attorney once he transferred to the Vallejo Police Department.  During the representation provided while he was a member of the Sausalito and Central Marin Police Departments, McMAHON mentioned to me that it was his dream to lateral transfer to the Vallejo Police Department since he was from that community.  In response I cautioned that I would not be available to assist him should any issues arise once he transferred because I was not an authorized panel provider for the Vallejo Police Officers' Association.

i. Ryan mentioned his desire to lateral transfer to the Vallejo Police Department several times during the course of the representation I provided, and I generally expressed my opinions about the differences

5

1   between the Vallejo Police Department and the departments at which he

2   then-worked.  I also generally expressed that while I would be happy for

3   him to achieve the dream, I would be sad that I could not assist him if any

4   issues arose once he transferred since I was not one of the panel attorneys

5   for that organization.

6      b.  McMAHON knew that, as of June 24, 2016, I was no longer providing him any

7   legal representation.  On that date, I wrote a closing status report to PORAC LDF

8   concerning the outcome of Case No. 15-3187 and requested the file be closed.

9         i.  Providing status reports to PORAC LDF is part of the responsibilities set

10   by the PORAC LDF attorney engagement rules.  Reports are entered into

11   the electronic system used by PORAC LDF for case management.  The

12   engagement rules that were in effect at the time of this report specifically

13   stated: "LDF case coordinators must be kept informed, in a timely

14   manner, of all case developments … LDF will maintain the confidential

15   and/or privileged material provided to LDF by panel attorneys."

16        **ii.**  After submitting the closing status report, I sent a closing representation

17   letter directly to McMAHON.  (**<u>Exhibit A</u>**.)

18       iii.  As PORAC LDF is an ERISA trust, all representation provided by me on

19   assigned matters must be done in accordance with the provisions of its

20   Plan Document as well as the panel attorney contract, engagement rules,

21   and code of conduct.

22       iv.  Included in the engagement rules is a requirement that file records be

23   maintained for seven (7) years.  The rules additionally and specifically

24   state: "Time entries may be audited by LDF and supporting

25   documentation must be retained for review (e.g., correspondence, email

26   messages, calendar entries, telephone call records, etc.)."

27         1.  As a result, my office uses a variety of software and systems to

28   maintain records of all relevant documents and materials related to

6

1                 the matters we handle documents, including records of all

2                 telephone calls, and emails.

3          2.   We follow the same practices for all cases, regardless of whether

4                 this office was engaged through PORAC LDF, privately, or

5                 through other organizations.

6      20.     Although the statement made by McMAHON that I represented him "multiple" times is

7 true, other facts in the McMAHON declaration are untrue.

8      21.     For example, under penalty of perjury McMAHON stated in paragraph 7 that I

9 represented him "while [he] was working for the ***San Pablo police department*** since June 12, 2012."

10 (Docket No. 28-1 at ¶7 [emphasis added].)  That is untrue.

11      22.     I have never represented McMAHON in connection with any investigations conducted

12 by the *San Pablo* Police Department. Indeed, McMAHON was *not* employed by the San Pablo Police

13 Department in June of 2012 when I represented him, or in connection with any of the other cases I

14 handled.  At all times from 2012-2015 when I provided representation to McMAHON in four separate

15 cases, he was employed by either the Sausalito Police Department or the Central Marin Police

16 Department.

17      23.     The following documents from my files, redacted to remove personal information such

18 as contact information, corroborate that McMAHON's statement that I represented him when he

19 worked for San Pablo is incorrect and untrue:

20          a.   Attached hereto as **<u>Exhibit B</u>** are true and correct redacted[1] copies of the PORAC

21              LDF case assignment sheets for each of the cases I handled for Ryan McMahon.

22              Each of those case assignment sheets identify the agencies at which Ryan

23              McMahon was employed when the assignment was made.  None reflect he was

24              employed by the San Pablo Police Department.

25          b.  Page 1 of Exhibit B is a copy of the case assignment sheet for Case No. 12-1685,

26

27         [1] The redactions only removed handwritten notes made by office staff during the intake phone call as well as confidential personal information about McMAHON that was on the form when it was provided to my office by PORAC LDF.

28

the first case I handled for McMahon, and the one that he claims involved his employment at the San Pablo Police Department in June 2012. (See, Docket No. 28-1 at ¶7.)  Specifically, McMAHON declared under penalty of perjury: "[S]he represented me while I was working for the San Pablo police department since June 12, 2012." (*Id.*)

   i.   In the top right corner of Exhibit B, page 1, circled in red, is that date the document was printed by my office: "6/18/12."

   ii.   In the first section "Matter Profile," circled in red is the date the matter was opened by PORAC LDF ("since 6/12/2012") as well as the organization name from which the case was generated: "Sausalito Police Association."

   iii.   In the "Matter Information" section further down on the page (not circled in red) that same information is repeated.

   iv.   Nowhere on this document is the San Pablo Police Department mentioned.

   v.   Over the course of my career, I have provided representation for multiple members of the San Pablo Police Department through its union, the San Pablo Police Employees' Association.  My most recent case for San Pablo began in 2022 and extended into 2023. That matter was assigned through PORAC LDF. Membership in the San Pablo Police Employees' Association was designated on that case assignment sheet by the following information:

> MemberID Status AssnID Assn Name Start Date End Date Pln Scp Opt
> 212492 A 2713 SAN PABLO POLICE EMPLOYEES ASSN 11-Jul-03  1   A

The information in the above box reveals that as early as July 2003, the San Pablo Police Employees' Association subscribed to the PORAC LDF program.  That comports with my experience, as I recall being assigned PORAC LDF cases at the San Pablo Police Department during the late

DECL OF ALISON BERRY WILKINSON IN OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY
*McMahon v. Whitney, Case No. 2:23-cv-01972-KJM-JDP*

1990's, as well as after the year 2000.  This is a long way of demonstrating that if what McMAHON said was true – that I represented him in 2012 while he was employed at the San Pablo Police Department – the identifier pictured above would have appeared on the case information sheets attached hereto as Exhibit B.

vi.   Also in that "Matter Information" section, circled in red, are two entries showing "Years in Dept" and "Years as PSO."  Having received and reviewed hundreds of these reports over my career, I know those categories to be part of the intake process at PORAC LDF.

vii.   The phrase "Years in Dept" means the number of years the employee has worked at his/her/their current organization.  On Page 1 of Exhibit B, the number entered from Ryan McMahon is "02." That entry signifies that at the time the case assignment was made to me in or around June 2012, McMAHON had been a member of the Sausalito Police Association for approximately two (2) years, i.e., from 2010-2012.

viii.   The phrase "Years as a PSO" means the number of years the employee has worked as a "Public Safety Officer."  Page 1 of Exhibit B  the number entered is "02," signifying that the Sausalito Police Department was his first position in law enforcement.

ix.   Attached hereto as **Exhibit C** is a redacted copy of the memorandum issued to Ryan McMahon by the Sausalito Police Department on June 2, 2012, which was faxed to me by Ryan McMahon on June 22, 2012.  That document likewise demonstrates that the representation I provided to McMahon in 2012 involved the Sausalito Police Department not the San Pablo Police Department.

1.   In the upper right hand corner of that faxed document is handwriting that states: "LDF Case 12-1685."  That is not my handwriting.  Rather, it was on the document when faxed to me. It

9

is my belief that number was written on the memo by McMAHON when he contacted PORAC LDF to initiate a claim and receive his case assignment.

    c.   Page 8 of Exhibit B  is a true and correct redacted copy of the PORAC LDF case assignment sheet for the case I began handling in 2015 while McMAHON was employed at the Central Marin Police Department. That document confirms McMAHON became a member of the Central Marin Police Officers' Association on or around November 3, 2015, and had less than one-year in that department at the time the case was opened.  It also demonstrates that PORAC LDF case assignment records reflect every agency the employee has worked for, not just the agency the employee was working at when the matter was assigned.

    d.   Nowhere in Exhibit B does it indicate that McMAHON was ever a member of the San Pablo Police Employees' Association during the time period of 2012-2015, or when I represented him in the assigned cases.  If he had been, information similar to what is contained in paragraph 23(b)(v) above would have been included on his case assignment sheets.

24.    The information in Exhibit B confirms that when I represented McMAHON from 2012-2015, he was a member of the *Sausalito* and/or *Central Marin* Police Departments and *not* the *San Pablo* Police Department as he attested under penalty of perjury in paragraph 7 of Docket No. 27-1. The declaration McMAHON filed is incorrect and contains a fact that is simply not true.

25.    I cannot think of any reason why McMAHON would attest, under penalty of perjury, to having been represented by me while employed at the San Pablo Police Department knowing that, at the time of the representation, he was employed by the Sausalito and/or Central Marin Police Departments.

26.    In my view, McMAHON's inability to accurately identify where he was employed at the time I represented him is significant.  I can think of no reason why he would misrepresent where he was employed from 2012-2015, and so can only conclude either that his memory is unreliable or that he has a reckless disregard for truth, accuracy and the significance of attesting facts under penalty of perjury.

10

27.     McMAHON likewise inaccurately identified in ¶¶35-36 of his Declaration that in he called "*the Pablo police department*" to ask "about John Whitney's hours."  (Docket No. 28-1 at ¶¶35-36 [emphasis added].)  That call was actually placed to the *El Cerrito Police Department.* Those inaccuracies are discussed *infra* in Section B(1).  That inaccurate information likewise supports the concern expressed above about whether McMAHON's memory is unreliable or he has  a reckless disregard for the truth.

28.     Nothing about the present lawsuit filed by my former client, RYAN McMAHON against my current client JOHN WHITNEY, is related in any fashion, let alone substantially related, to the representation I provided to McMAHON while he was a member of the Sausalito Police Association and the Central Marin Police Officers' Association.  I explained this in a letter to Ms. Albert dated October 16, 2023, a true and correct copy of which is attached hereto as **Exhibit D**.  Although that letter was written analyzing the facts from the original complaint (Docket No. 1), the same is true for the proposed amended complaint (Docket No. 24-1).

## B.     THE TWO COMMUNICATIONS WITH RYAN MCMAHON AFTER 2016

29.     In his declaration, McMAHON claims that he "had at least three phone calls" with me between December 2019 and February 2020 regarding the Vallejo police department.  (Docket No. 24-1 at ¶12.) The declaration suggested as well that there may have been more than three phone calls during which we "kept in touch." (*Id.* at ¶¶6-9, 12, 16, 24, 35-37.)

30.     I was surprised by that statement, as my recollection was different.  As a result, I undertook the laborious process of examining all my call records, emails, and text messages.  Based on that research, which is described in more detail *infra*, I found that I did not have "at least three phone calls" with him between December 2019 and February 2020.  Rather, I had *two* phone calls with McMAHON, both of which occurred outside the time period he attested to in his declaration.  On of those calls occurred on July 16, 2020 and the other on September 14, 2023.

31.     The investigative process I used was to first check my call records, emails, and text messages for the limited time period specified in McMAHON's declaration, i.e., "between December 2019 through February 2020." (Docket No. 28-1 at ¶12.)  I found record of no communications

11

1    between me and Ryan McMahon during that time period.

2        32.    Given that there were other incorrect and untrue statements in McMAHON's declaration

3    (e.g., his representation that he worked at the San Pablo Police Department), I expanded my search for

4    communications with McMAHON to the time period between January 2019 through February 2020. I

5    found only two communications.

6            (1)    THE SEPTEMBER 24, 2023 PHONE CALL

7        33.    The first phone call I found in my records occurred on September 14, 2023.  That is the

8    phone call referenced in Plaintiff's declaration at ¶¶35-40, which was documented in the email I sent

9    on September 15, 2023 to McMAHON's former counsel, Justin Buffington, a true and correct copy of

10   which is attached hereto as **Exhibit E.**  That email stated:

11

12           I am not sure if you are still representing Ryan McMahon, but he
             called the El Cerrito Police Department looking for my client, John
13           Whitney.  I returned the call on Whitney's behalf, uncertain whether
             he was just offering congratulations for the recent settlement, or for
14           some other reason.  He indicated his attorney wanted him to find out
             when Whitney was working so a subpoena for his upcoming
15           arbitration could be served.

16           However, the connection on the call was scratchy, and when I asked
             who his attorney was, I could not understand what he said except that
17           it was someone out of Southern California.  I thought perhaps it might
             be an RLS attorney from one of the other offices.
18

19           Upon learning he was calling about a matter on which he was
             represented, I ended the call.  I thought I should let you know.
20

21   (Exhibit E.)

22       34.    Shortly thereafter, Justin Buffington replied:

23           We don't rep him anymore due to a conflict ther [sic] developed
24           involving another VPOA member. I don't know who represents him.

25   (Exhibit E.)

26       35.    On September 18, 2023, at 6:09 p.m., I was notified that the counsel who represented

27   WHITNEY during the settlement of his whistleblower lawsuit, Jayme Walker, had been contacted by

28   Open Vallejo about a lawsuit filed by McMAHON that named WHITNEY as a defendant.  This was

12

the first I learned about the lawsuit.

36.     I then proceeded to research the information provided,  located Docket No. 1 on the PACER website, and learned that Lenore Albert was McMAHON's current attorney.

37.     At 7:00 p.m. that same day, I forwarded to Ms. Albert the email I had previously provided to Mr. Buffington so that she would be aware of my September 14, 2023 phone call with McMAHON.  (Exhibit E.)  That email chain included a reference by me to "my client, John Whitney".  (*Id.*)

38.     According to my call records, my September 14, 2023 phone conversation with McMAHON lasted approximately five (5) minutes.  A true and correct copy of the phone log call record related to that conversation is attached hereto as **Exhibit F.**

39.     At the beginning of the phone call (as McMAHON acknowledges), I advised I was calling to inquire "why [he] was asking [the El Cerrito Police Department] about John Whitney and if [he] was going to congratulate him on his win with Vallejo."  (See, Docket No. 28-1 at ¶37.)

40.     When I called  McMAHON in September 2023, I had no reason to believe he was in an adversarial position to WHITNEY.  I had (apparently wrongly) assumed that WHITNEY and McMAHON were still allied in that they had similar experiences with the City of Vallejo running roughshod over their rights, an opinion I expressed to his prior counsel, Justin Buffington, in August 2020.  (See, *infra* at Section C(2).)  I assumed when I placed that call that McMAHON was going to congratulate WHITNEY on the $900,000.00 settlement in his whistleblower action and likely ask for the contact information for the attorney who secured that outcome.

41.     During the conversation, I expressed to McMAHON that I believed he had been unfairly treated by the Vallejo Police Department and how sorry I was that he and his family had wrongly suffered. I likely did, as alleged by McMahon in Docket No. 28-1 at ¶24,  use the phrase "drug through the mud" to describe what the CITY OF VALLEJO (not WHITNEY) had put him through, and likely also expressed that I was "truly sorry" he had that experience.

42.     Although McMAHON attests that I commented he had been "screwed over," (Docket No. 28-1 at ¶37), I do not recall using that phrase specifically.  However,  it is not impossible. Generally, I use the less vulgar phrase "got a raw deal," but I have, on occasion, told people they are

"screwed."

43.     During the conversation on September 14, 2023, I believed that McMAHON and WHITNEY remained allied in their shared experience of having been treated poorly by the Vallejo Police Department, as they had been in July and December 2020. (See, *infra*, at Section C(2).)   I had no reason to believe otherwise nor any reason to suspect there might be a conflict of interest.

44.     One of the reasons I continued to believe that McMAHON and WHITNEY were allied was that McMAHON told me that the reason he contacted the El Cerrito Police Department was that he wanted to serve WHITNEY with a subpoena for his upcoming arbitration. (See, **Exhibit E**.)   I understood that to mean McMAHON wanted my client to testify on his behalf during the arbitration just as WHITNEY had submitted a declaration on McMAHON's behalf in 2020.  (See, *infra*, at Section C(2).)

45.     At no time during the September 14, 2023 conversation did McMAHON indicate that he had filed a lawsuit against WHITNEY, and in his declaration (Docket No. 28-1), it is notable that McMAHON does not allege that he told me he was in an adversarial position to WHITNEY or that he had filed a lawsuit against WHITNEY.

46.     McMAHON alleges that I "never" told him during our conversation that I "was representing John Whitney."  I do not know whether I specifically used those words, but it was obvious to me that McMAHON knew I represented WHITNEY.  Indeed, I told McMAHON I was calling on WHITNEY's behalf in response to McMAHON's call to the El Cerrito Police Department inquiring about WHITNEY's  work schedule, and asked if he was going to congratulation WHITNEY on his win. McMAHON acknowledged that in his declaration.  Further, McMAHON knew in 2020 that I represented WHITNEY, as I had facilitated the filing of a declaration from WHITNEY, *in support* of McMAHON, in December 2020.  Further, I had directly advised McMAHON in July 2020 that I represented WHITNEY.  (See, infra, at Section B(2).)

47.     McMAHON's recollections and characterizations of our conversation in September 2023 are not accurate.  At  ¶¶35-36 (Docket No. 28-1), McMAHON indicates our conversation occurred because he "was trying to find out what" my client's working hours "by calling the *Pablo* police department."  (Docket No. 28-1 at ¶35 [emphasis added].) Defendant WHITNEY has never

14

worked for the "Pablo" police department.  That statement, made under penalty of perjury, is untrue. In September 2023 (and still today), WHITNEY worked for the *El Cerrito* Police Department.

48.     McMAHON also alleges that "[s]omeone at the *Pablo* police department must have called [me]" to advise of his inquiry. (Docket No. 28-1 at ¶36 [emphasis added].)  That is also incorrect and untrue. A member of the El Cerrito Police Department advised Defendant WHITNEY that McMAHON had called, who then advised me.

49.     I cannot think of any reason why McMAHON would attest, under penalty of perjury, to having called the "Pablo" police department when he actually called El Cerrito. In my view, McMAHON's inability to accurately identify what police department he called in September 2023 suggests either that his memory is unreliable or he has a reckless disregard for the significance of attesting to facts under penalty of perjury.

### (2)     THE JULY 16, 2020 TELEPHONE CALL

50.     I continued my phone record investigation, initially focusing on McMAHON's allegation that I had three (3) phone calls with McMAHON between December 19, 2020, and potentially others.

51.     As indicated*, supra*, my office uses a variety of software to maintain records of all telephone communications.  For my business I use two phone numbers: my mobile and my office line.

52.     The office line is managed by a service called Ruby Receptionists and all calls placed to that line are automatically routed directly to that service.  The line does not ring on any of my phones; rather, a call to my office line is directed to the Ruby Receptionists, which then either take a message, send the call to voicemail, or transfer the call to my mobile phone.

53.     The Ruby service sends me a text message and an email with every call made to my office line.  These messages include information about the phone number called from, the identity of the person or company that called,  the length of the call, and any communications the reception team had with the caller.

54.     I get a text and email message for every call that is answered, whether live or by the voicemail system, even if the result is the person hung up, the call was a fax tone, the caller stated it

15

was a wrong number, the call went directly to voicemail, or the call was transferred to my mobile phone.   Sample text and email messages from Ruby Receptionists, appropriately redacted to protect the privacy of the callers, are attached hereto as **Exhibit G.**

55.     I ran a search of all the emails and text messages I received from the Ruby service from January 2019 through October 2023 using the following criteria: (1) the name McMahon; (2) the name Ryan; (3) the shorthand "Mc" and its alternate potential misspelling "Mac", and (4) the last four digits of the cell phone number that I had in my contacts list.  I found no calls placed to my office line by McMAHON during that time period.

56.     For call records on my mobile phone, I use a program called  "PhoneView," which collects a record of all calls placed to or from my mobile phone.  The PhoneView software is produced by Ecamm Network LLC and allows me to download a record of each and every phone call made to and from my mobile phone, each and every text message sent to or from my mobile phone, as well as every voicemail left on the phone. I also use the Ecamm software "iMazing," which is an updated version of PhoneView, to collect similar data.

57.     The PhoneView and iMazing software start automatically whenever my work laptop is turned on.  The app connects automatically to my mobile phone wirelessly and by a USB cable. Once connected, the software downloads the contents of the phone automatically.

58.     When the automatic download feature activates, the program opens on my desktop so that I see it is happening.  If the phone is locked when the download starts, I have to press buttons on my phone to approve access by the software on my laptop.  If the phone is already unlocked, I do not have to approve.  As a result of these software features, I am aware the PhoneView and iMazing programs download my phone contents nearly every day, and sometimes multiple times a day.

59.     I use the PhoneView and iMazing records both to ensure my billing and time entries are accurate, as well as to ensure that I have a record of all calls and texts for auditing purposes.

60.     Using the PhoneView and iMazing software, I can save phone logs and text messages from my mobile phone to my computer both in the program as well as exported to a PDF format. Monthly when I am completing the invoicing and billing process, the call logs and text messages are downloaded and saved in PDF files labeled by month and year for easy access and reference.  Each year

16

1  has twelve monthly PDF files of phone call logs, and twelve monthly PDF files of text messages.

2  Occasionally I also do a full annual extract of data so that an entire year is in one file.  I did that for the

3  year 2020, extracting all text messages on the phone in January 2021 and saving it to a single PDF file

4  folder.

5       61.    In what was a tedious and time consuming task involving the review of thousands of

6  pages of records, I ran a text search in each individual monthly phone call PDF file from January 2019

7  through October 2023 using the following criteria: (1) the name McMahon; (2) the name Ryan; (3) the

8  shorthand "Mc" and its alternate potential misspelling "Mac", and (4) the last four digits of the cell

9  phone number that I had in my contacts list for Ryan McMahon.  I also ran the same search in the

10  annual PDF downloads I had maintained.  I found no calls placed to my mobile phone by Ryan

11  McMahon during that time period.

12       62.    I did the same for each individual monthly PhoneView text message PDF file in the

13  event Ryan had texted me rather than called.

14       63.    These searches revealed that I communicated directly with Ryan McMahon only *two*

15  times in the period between January 2019 and October 2023.  One was the phone call on September 14,

16  2024, described *supra*, at section B(1).  The other was a phone call I placed on July 20, 2020.

17       64.    I was surprised to discover I called McMAHON on July 20, 2020, as I did not remember

18  doing so.  Since it is my habit to document phone calls in a follow-up email, I proceeded to search my

19  emails for the time frame surrounding the July 20, 2020 call.

20       65.    That email search revealed that at 6:01 p.m. on July 20, 2020, I received an email *from*

21  McMAHON with the subject line: "Fwd: Verification for Petition.pdf."  The email stated: "Looks good

22  the only question I have is in the first paragraph….Is that supposed to be that way or do you need to

23  insert."  A true and correct copy of that email, with the attachment, is included herewith as <u>Exhibit S</u> at

24  pages 1-2.

25       66.    At 6:15 p.m., I telephoned Ryan McMahon from my mobile phone, and we talked for

26  approximately three (3) minutes. A true and correct copy of that call record (secured from PhoneView)

27  is attached as **Exhibit T.**

28       67.    At 6:21 p.m., I sent McMAHON an email message as a follow-up to our phone call.

17

That email stated:

> Thank you for taking my call and confirming the email below was misdirected and meant for Justin Buffington rather than as a request for a consult with me.  I had heard rumor that you were going to file a writ against the City related to the pending investigation, and I am glad to see it moving forward.  As you know, my client John Whitney likewise has been poorly treated by the City.  If collaboration would be helpful, please have Justin reach out."

A true and correct copy of that follow-up email is attached hereto at **Exhibit S**, page 3.

68.     Reviewing those records refreshed my recollection that when I received the email sent at 6:01 p.m. from Ryan McMahon, I was uncertain whether it was a mis-directed communication or whether he was contacting me to initiate an independent consult concerning the petition he was planning to file and/or the legal parameters of a verification form.

69.     As I am regularly contacted by individuals seeking advice independent of their primary attorney (also known as a second opinion), I am aware that such persons do not always want their current attorney to know that they are contacting me.   In having such conversations, I keep at the forefront of my mind that California Rule of Professional Conduct 4.2 prohibits a person from communicating directly or indirectly with a represented party but "does not prohibit communications initiated by a represented person seeking advice or representation from an independent lawyer of the person's choice."   It also "does not prohibit communications with a represented person concerning matters outside the representation." (See, https://www.calbar.ca.gov/Portals/0/documents/rules/Rule_4.2-Exec_Summary-Redline.pdf at Comments [4] and [5].)

70.     In our conversation, McMAHON confirmed he was not seeking an independent consult, but had misdirected an email intended for his then-current counsel, Justin Buffington.  That McMahon was not seeking legal advice or assistance was confirmed in the follow-up email that was sent.  (Exhibit H.)

71.     After confirming McMAHON was not seeking any legal advice, guidance, or consultation, he and I proceeded to catch-up.  During that conversation I expressed empathy for how difficult Ryan's situation was, support for his challenging the maltreatment he suffered from the City of

Vallejo, and also let him know that if there was anything I could do, or that John Whitney could do, to held, that he should have his counsel reach out.  I did not provide any legal guidance or advice, nor did we re-establish an attorney-client relationship during the call.  Rather, I simply let Ryan know that me and John Whitney were both available to help, if needed.

72.     Based on the search of my phone records, text messages, and emails, I can state with confidence that I only spoke with Ryan McMahon two times after he joined the Vallejo Police Department: on July 16, 2020 and on September 14, 2023.

**C.     COMMUNICATIONS WITH McMAHON'S COUNSEL**

73.     On July 28, 2020, the news publication Open Vallejo posted an article entitled: "Vallejo police bend badges to mark fatal shootings."  A true and correct copy of that article is attached hereto as **Exhibit H.**  That article can also be found at the following link:

https://openvallejo.org/2020/07/28/vallejo-police-bend-badge-tips-to-mark-fatal-shootings/

**(1)     COMMUNICATION WITH McMAHON ATTORNEY DALE ALLEN ON JULY 29, 2020**

74.     The next day, July 29, 2020, attorney Dale Allen sent me a text message that stated: "You free to talk RE Vallejo? Pretty important on a Burris case I have."  I responded:  "perfect timing; I just finished a settlement conference with Judge Beeler.  Call away."  A true and correct copy of that text message, extracted from my PhoneView records as part of the 2020 year-end extraction, is attached hereto as **Exhibit I.**

75.     Dale and I spoke by telephone twice on July 29, 2020.  During those conversations, Dale indicated he was representing Ryan McMahon in the federal civil rights lawsuit arising out of the McCoy shooting. (See, U.S.D.C. Eastern District Case No. 2-19-cv-01191-JAM-CKD.)

76.     Dale was seeking information about the badge bending reported by Open Vallejo on July 28, 2020, which I provided.  In that call I served as a resource to Mr. Allen to assist in his defense of McMAHON, not as counsel for, or in the personal interests of, Ryan McMahon.  Indeed, from the outset of that call, Dale Allen was aware I represented JOHN WHITNEY, not Ryan McMAHON, in connection with the badge bending issues because he told me he had read the article that had appeared that morning in the San Francisco Chronicle about the badge bending issues in Vallejo. A true and

correct copy of that article naming me as the attorney for John Whitney is attached hereto as **Exhibit J.** I confirmed in the call that I did, indeed, represent WHITNEY.

77.     At no time during that call did I provide advice to McMAHON, or establish an attorney-client relationship with McMAHON.  Rather, I served simply as a resource for McMAHON's counsel.

**(2)     COMMUNICATIONS WITH McMAHON ATTORNEY JUSTIN BUFFINGTON FROM AUGUST to DECEMBER 2020**

78.     On August 4, 2020, I was contacted by attorney Justin Buffington concerning my representation of John Whitney and his representation of Ryan McMahon.  At that time, Mr. Buffington represented McMAHON in his administrative disciplinary case, and I represented WHITNEY in connection with his termination and claims of whistleblower status. That contact was initiated by an email sent by Mr. Buffington in which he accused WHITNEY of releasing confidential personnel information about McMAHON.  A true and correct copy of that email is included with Exhibit L attached hereto.

79.     That accusation prompted me to call Mr. Buffington to discuss the matter directly since I felt he might be operating off an incomplete set of facts.  I often believe such matters are best handled by direct communication rather than a flurry of emails.  I left a voicemail for him, which he returned promptly.

80.     During our telephone conversation, Mr. Buffington and I discussed the issues related to McMahon's current employment predicament as well as Whitney's, and the badge bending allegations. During that conversation, Mr. Buffington issued an apology for the accusation made about the release of confidential personnel records, which I accepted.  It was clear to me from that conversation that Mr. Buffington rescinded the accusation because I had provided him with facts of which he was not aware.

81.     The emails regarding those discussions, as well as the call records related thereto, are attached hereto as **Exhibit L.**

82.     The final email in that chain, which summarizes my conversation with Mr. Buffington, stated:

> Thank you for the call right now.  I am glad we were able to straighten that out, and I very much appreciated your apology.

As we discussed, John Whitney never named or "dimed out" McMahon to anyone, let alone the press, and released no confidential information.  Nothing Whitney said in his claim, pending lawsuit, or to the press pointed toward McMahon.

Indeed, what Whitney does know makes him an ally for McMahon. Both of them have similar experiences – the City running roughshod over their POBR, due process, and other statutory rights.  When you get a copy of the lawsuit, you'll see what I mean.  Moreover, it seems to me that Whitney is the chief witness for the defense if they come after Ryan on the badge bending because he can confirm the discovery timeline for a statute of limitations defense.

As we also discussed, I personally have great fondness for [Ryan] having known him both at Sausalito PD and Central Marin. When I learned Ryan was part of the badge bending, my personal opinion (shared with no one other than you and my client) was that Ryan is a good person who fell in with the wrong crowd and was likely pressured into having his badge bent.  My client holds the same view.

I'd be interested in a copy of the Petition you filed for McMahon.  If you would be so kind as to forward a copy over, I would greatly appreciate it.  Given what you told me, I'm wondering if I can use that to establish a POBR violation pattern for 3309.5 malice purposes.

(Exhibit L.) The call record referenced in that email is attached hereto as **Exhibit M.**

83.     My takeaway from the conversation with Mr. Buffington was that while the interests of WHITNEY and McMAHON were different, as a result of both having been treated poorly by the CITY OF VALLEJO, they were aligned, not conflicted.

84.     **Exhibit L** further demonstrates that the statute of limitations has run on any claim by McMAHON that WHITNEY released confidential information related to the badge bending allegations, which are the subject of his proposed amended complaint (Docket No. 24-1.)  On August 4, 2020, McMAHON's attorney, Justin Buffington, send me an email stating: "I believe that your client released confidential and privileged personnel information about Officer McMAHON."  We then discussed the issue, and Mr. Buffington apologized for the unfounded accusation. In that Plaintiff, through his counsel, apologized in July 2020 for accusing WHITNEY of releasing confidential information about him, and given that WHITNEY had helped McMAHON in his quest to secure fair treatment from the CITY OF VALLEJO, I had no reason to believe that in September 2023 would

21

pursue any claim against WHITNEY whatsoever, let alone one based on the same set of facts for which Plaintiff had apologized in July 2020 or that my former client was in an adverse posture to my current client.

85.     Mr. Buffington thereafter contacted me in October 2020 inquiring whether WHITNEY "would be willing to sign a declaration" on behalf of McMAHON.  A true and correct copy of that email is attached hereto as **Exhibit N.**

86.     Mr. Buffington and I thereafter exchanged numerous emails concerning the declaration, which was finalized on December 2, 2020.  I have not attached the emails because they total over 350 pages.  Should the court wish to inspect those, I would be happy to provide them.  That email chain amply demonstrated that I coordinated through counsel, not McMahon, and that McMahon and his counsel were well aware that I represented John Whitney and never raised any issue of a conflict of interest or any violation of my duties to a former client. Those emails also demonstrate that there was no *quid pro quo* for the help provided by WHITNEY to McMahon as alleged in Docket No. 28-1 at ¶26.  Neither me nor my client ever conditioned WHITNEY's assistance on McMAHON speaking out on any subject.

87.     The emails coordinating the declaration also stand in direct contrast to what McMAHON attested to in paragraph 12 of his declaration.  He and I did not directly discuss a declaration in the time between December 2019 through February 2020.  Rather, I discussed and coordinated the declaration during October, November, and December of 2020 with Justin Buffington.  These emails also are clear that Mr. Buffington was operating as the attorney for McMAHON, and I was operating as the attorney for WHITNEY. At no time did anyone suggest that WHITNEY and McMAHON stood in conflicting positions.  Rather, it appeared they were allied.

88.     On or around August 23, 2023, Mr. Buffington sent me the final decision in connection with the case filed by McMAHON for which WHITNEY provided a supporting declaration.  A true and correct copy of those communications are attached hereto as **Exhibit O.**

D.     **COMMUNICATIONS WITH THE BROADMOOR POA**

89.     On dates unknown, McMAHON was hired by the Broadmoor Police Department.

22

90.     On November 10, 2022, ABC7 News reported that McMAHON had been hired by the Broadmoor Police Department.  A true and correct copy of that article is available at: https://abc7news.com/vallejo-police-shooting-ryan-mcmahon-officer-fired-broadmoor-department/12434465/   That article was the first time I learned McMAHON had secured a position at that agency.

91.     I serve as legal counsel for the Broadmoor Police Officers' Association, which represents the interests of the officers employed by the Broadmoor Police Department.  I advise that labor organization (a.k.a. union) as to its rights and responsibilities in labor related matters.  They are one of my organizational clients.

92.     Michael Davis is the current Vice President of the Broadmoor Police Officers' Association (hereafter "BPOA"), and presently holds the rank of Corporal at the Broadmoor Police Department.

93.     I have known Corporal Davis for decades, having first met him many years back when he was the president of the Sausalito Police Officers Association. Corporal Davis is aware that I represent former Vallejo Police Captain John WHITNEY.

94.     In the fall of 2022 and extending into the first half of 2023, Corporal Davis contacted me as the Association Vice President about several issues that had arisen that impacted the rights and responsibilities the BPOA has towards probationary employees, employees placed on administrative leave, and employees subject to layoff.  Those contacts were not exclusive to Ryan McMAHON who, at the time was a member of the BPOA.

95.     I only recall one contact related to McMAHON's employment status with the Broadmoor Police Department, which was in January 2023.  The specifics of the discussions are protected by the attorney-client privilege, which has not been waived by the Association.  But any advice I provided about any issue related to Ryan McMAHON was *to the Association* in connection with *its* duties and responsibilities, and *not* to Ryan McMAHON with regard to his individual rights or options.

96.     I did not ever provide advice for McMAHON to follow while "on retainer from the POA" as alleged in paragraph 17 of Docket No. 28-1.  Rather, I provided advice *to the Association* so

23

that it could fulfill its duty of fair representation to its members.

97.     In  paragraph 17 of Docket No. 28-1, McMAHON alleges that I "mentioned how sorry [I] was for [McMAHON]."  While I cannot share the details of that conversation due to its privileged nature, as discussed *supra*, over the years I have had great empathy for how poorly McMAHON was treated by the CITY OF VALLEJO both during and after his employment.

98.     I never received any confidential information from McMAHON about his employment at the Broadmoor Police Department nor did I ever discuss with him his situation at that jurisdiction.

**E.      THE ALLEGED "KRON 4" CHRISTMAS EVE NEWS BROADCAST**

99.     In his declaration at paragraph 30, McMAHON claims that "John Whitney had a news interview with Kron 5 on Christmas Eve 2020."  (Docket No. 28-1 at ¶30.)  That is untrue.  The news interview was with ABC7 News.  That interview was an "exclusive" and no other interviews aired that day.  A true and correct copy of the ABC7 News story is attached as Exhibit P, and can also be found at the following link: https://abc7news.com/vallejo-police-department-john-whitney-pd-badge-bending-whistleblower/9038302/

**F.      THE POSTING OF WHITNEY'S HOME ADDRESS ON THE PACER WEBSITE**

100.    I notified McMAHON's attorney Lenore Albert on September 18, 2023 that John Whitney was my client (a fact her client already knew), and expected that she would coordinate all other communications through me.  (See, Exhibit E.) Consequently, I was surprised (and dismayed) when I was learned that Ms. Albert sent litigation-related materials to my client's home on or around September 21, 2023.

101.    I have been practicing law since 1988.  I have never had an attorney send communications directly to my client after being notified that I am the legal representative regardless of whether a formal appearance in court had yet been made.  Rather, it is my experience that confirmation of representation is secured and all communications – including service of process – is facilitated through my office.  Indeed, I have worked collaboratively with multiple counsel over the years to efficiently and economically effect service in federal litigation through the procedures permitted by Fed. R. Civ. Proc. 4(d).

102.     I was further dismayed when I reviewed the materials Ms. Albert sent directly to my client to see that Ms. Albert had placed my clients home address on the proof of service and publicly filed it on the court's website. (Docket No. 5.) In that WHITNEY is an active peace officer, I requested she take it down pursuant to Government Code section 7928.215.  A true and correct copy is attached hereto as **Exhibit Q.**  Although she promised to do so, Ms. Albert never did.  It remains on the Court's website at Docket No. 5. A true and correct copy of Docket No. 5 is attached hereto as **Exhibit R.**

103.     In Ms. Albert's declaration at ¶8, Ms. Albert states "I discovered I had never filed her client's address to the docket," suggesting that I had wrongly accused her.  I did not.  The proof of service attached to Docket No. 5 contains the home address of my client on the date he was served the Notice Declining to Relate Cases, which was after I had notified Ms. Albert I was John Whitney's attorney.  (Exhibit R; Docket No. 5 at page 2.)

104.     The statement that she "had never filed" the address to the docket is untrue.  (Exhibit R; Docket No. 5 at page 2.)

105.     In the aftermath of my request for the home address to be removed and service of process, Ms. Albert and I exchanged a series of emails. On September 27, 2023, Ms. Albert indicated she was in the hospital and would move to have the address sealed when she got out.  I did not know why Ms. Albert was in the hospital, but given her emails to me, it was clear she was attending to work-related business. In my September 28, 2023 email response, I included an opening line thanking her for getting back to me, which included the statement: "I am sorry to hear you are unwell, and wish you a speedy recovery.  I then responded to the substance of her earlier message and closed the email stating: "I do wish for you good health, and to get well soon!"  She replied a few minutes later from the hospital.  I replied shortly thereafter to the substance of her email and closed my email with the statement: "While I understand you are unwell, it appears you are able to work," and requested again she seal my client's home address. We had further email exchanges on that topic the same day (September 28, 2023) during which she mentioned that she had been in the hospital for a week and was generally unavailable.   A true and correct copy of this series of emails is attached hereto as **Exhibit U.**

106.     I did not respond until October 2, 2023, respecting that she was recovering from an unknown illness.  In that email I stated:  "As you are clearly unwell, I believe it would be more

25

appropriate to continue this discussion after you have recovered.  Please concentrate on getting better and contact me when you are released and available to address these issues." (Exhibit U.)

107.    On October 6, 2023 at 10:29 a.m., I received one of the strangest emails I have ever received from an opposing counsel.  It stated, in pertinent part:

> Are your actions showing you are a Doe Defendant in this case? Are you a co- conspirator? A leaker of confidential information? Have you misused your office? You have misquoted the law and asked your client to act unlawfully in avoiding personal service. Is your aggression based on hiding that you have been one of the people personally taking confidential information and leaking it to the press and now want to cover your tracks with a CPRA?
>
> Save my client some time here and just tell me now so I don't have to seek judicial intervention.
>
> I had a case once when working for the government and showed how the "attorney" representing the "client" who pulled off a dump and pump scheme was also a co-conspirator. So this show is not something new to me. Two co- defendants died in that case once the attorney was sussed out. One died of a heart attack on Catalina Island and the other fell off a cliff in Laguna Hills. Co- defendants don't have trouble covering their tracks, but I won't let you or anyone else cover these tracks here.

(Exhibit U at page 1.)  The email ended with a request for evidence preservation.

108.    I was flummoxed by that email, challenged at how to respond in a professional fashion, and uncertain if the email contents were symptomatic of whatever condition had hospitalized Ms. Albert.  I did, however, feel a response was necessary, and, at 2:46 p.m. on October 6, 2023 wrote, as follows:

> I am in receipt of your email below. To be honest, the accusations and suppositions are so far-fetched and baseless that I was initially speechless. Nothing you said is true or valid. My actions have been, and continue to be, both professional and legitimate.
>
> With regard to the CPRA request, as I previously advised (see my email of October 6, 2023 sent at 11:10 a.m.), I requested a copy of Mr. McMahon's claim using a lawful method (the CPRA) because (1) you were in the hospital and I did not want to trouble you for a copy while you were unwell, and (2) because I could not tell from the complaint filed whether there had been compliance with the Government Tort

1    Claims Act.

2    As to issue of service, I have not asked my client to avoid personal
     service. Nor has he avoided personal service. As I indicated previously
3    (see my email of September 28, 2023 sent at 6:04 p.m.), my client was
     out of town and receiving camera notifications about people who came
4    to his door. Several looked like process servers. I requested you
     coordinate service through my office. Thereafter, (at 8:43 p.m. on
5    September 28, 2023) advised you were welcome to send me a waiver
     of service pursuant to FRCP 4(d).
6

7    As to evidence preservation, I understand the obligations that apply,
     and am in compliance. Please do the same.
8

9    Finally, since you are obviously back at work, I would be grateful if
     you confirm that you have, as previously agreed, sealed the proof of
10   service you filed that contains my client's home address.

11   (*Id.*)

12   109.   She did not confirm, as requested.  Nor did Ms. Albert ever deny (until her declaration

13   on January 5, 2024) that she had not posted his home address.

14   110.   As my client no longer lives at the address posted, I chose not to further pursue the issue

15   of having the address removed or insist that. Ms. Albert comply with Government Code section

16   7928.215.

17   **G.   THE COMMUNICATIONS ABOUT DISQUALIFICATION**

18   111.   On October 13, 2023, I received an email from Ms. Albert in which she raised the

19   question of whether I was in violation of California Rules of Professional Conduct 1.7 due to having

20   previously represented her client, McMAHON.  She thereafter issued a correction noting it was actual

21   Rule 1.9 that applied to the situation.  In her email, Ms. Albert conceded that the prior representation

22   did not involve "the same transaction or occurrence" as the pending lawsuit. True and correct copies of

23   those emails are attached hereto as **Exhibit V.**

24   112.   I replied on Saturday, October 14, 2023 concurring that the issue was governed by

25   California Rule of Professional Conduct 1.9 and advised that I would "correspond in more detail on

26   [the] issue during the business week.  (*Id.*)

27   113.   On October 16, 2023, I responded with a seven (7) page letter setting out my perspective

28   on the disqualification issue.  A true and correct copy is attached hereto as **Exhibit D**.

27

114.    On October 18, 2023, Ms. Albert made a passing reference to the disqualification issue in an email responding to the Rule 11 "Safe Harbor" letter I had sent.  While that passing reference derided my choice to represent WHITNEY in the lawsuit filed by McMAHON, it did not take the position that I was precluded from representing him.  Nor did the email suggest Ms. Albert was going to file a disqualification motion.  Rather, that passing reference, a true and correct copy of which is attached hereto as **Exhibit X,** simply stated:

> I anonymously asked a group of attorneys if they would accept taking Whitney's case when you had previously represented McMahon in other police matters and they all 100% agreed they wouldn't touch it with a 10 foot pole. You probably were the attorney dropping personnel files off to the Vallejo Sun because I heard you were a nice, ethical attorney but your actions in this matter speak contrary.

(Exhibit X at page 1.)

115.    I did not hear again from Ms. Albert concerning the issue of disqualification until January 5, 2024, the day she filed the motion.  That was the first time I learned Plaintiff contended he had imparted confidential information to me about his employment at the CITY OF VALLEJO.  A true and correct copy of those communications are attached as Exhibits to the Declaration filed by Ms. Albert in support of her disqualification motion (Docket No. 28-2.)

**H.    THE PREJUDICE TO DEFENDANT WHITNEY**

116.    In mid-2019, I began representing John Whitney concerning the issues with his employment termination, and have continuously represented him on that, and other matters, since.

117.    I was the original counsel on the whistleblowing lawsuit filed by Whitney, a true and correct copy of which is attached hereto as **Exhibit Y**.  In July 2022, I had attorney Jayme Walker substitute in as counsel of record, and she handled the case thereafter through settlement with me participating only as a resource.

118.    The journey for Defendant WHITNEY has been long and complicated.  The issues related to the lawsuit filed by McMAHON have been the subject of numerous investigations and lawsuits.  It is a complex web that I believe would be difficult for a new attorney to absorb.

119.    Since October 2023, I have done extensive work on the allegations made by

DECL OF ALISON BERRY WILKINSON IN OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY
*McMahon v. Whitney, Case No. 2:23-cv-01972-KJM-JDP*

McMAHON against WHITNEY, including the filing of an anti-SLAPP motion. That work was made possible within the time limits required by law only due to my having a deep understanding of what has transpired over the last four (4) years. Substituting a new attorney at this juncture would significantly delay resolution of the issues, as he/she/they would need time to get up to speed. It would also significantly increase the attorneys' fees applicable to this matter.

120.   After October 18, 2023, it appeared to me Plaintiff had abandoned her claim I was disqualified, as it did not come up again.  Rather, Ms. Albert continued to work collaboratively with me as defense counsel, including forwarding service of process once complete, working collaboratively to provide me time to prepare a responsive pleading, meeting-and-conferring regarding my concerns about the sufficiency of the Complaint filed and whether she was going to amend the complaint, and entering into a stipulation to extend time to file a responsive pleading.

121.   My first formal appearance in this matter occurred on November 14, 2023, in connection with Docket No. 13, the Stipulation for Extension of Time to File Responsive Pleading.  In my view, if disqualification were required, and not simply an effort to gain a tactical advantage, the motion to disqualify should have been filed in the time immediately following the stipulation and before a responsive pleading was due.  Instead, Ms. Albert remained silent and appeared to have abandoned the issue.

122.   The second opportunity to raise the disqualification issue was after I filed the Rule 12(b)(6) on December 6, 2023. (Docket No. 15.) Instead, Ms. Albert continued to remain silent.

123.   The third opportunity to raise the disqualification issue was on December 16, 2023, when I filed the anti-SLAPP motion.  (Docket No. 20.) Instead, Ms. Albert remained silent until I noted in the reply pleadings I filed on January 4, 2024, in support of the anti-SLAPP motion that the "issues related to whether counsel for Defendant WHITNEY should be disqualified [were] resolved in October 2023, long before the filing of the anti-SLAPP motion." (Docket No. 27 at page 8:14-27.)

124.   The next day, January 5, 2024, *almost three (3) months* after our last communication about disqualification, Ms. Albert notified me she was going to file a disqualification motion, hurriedly met and conferred by email, and then filed the disqualification motion later that same day (Docket No. 28; Docket No. 28-4 at Exhibit A.)

29

125.     In his declaration in support of the disqualification motion, Plaintiff accused WHITNEY of "selling information to the media about private matters and then lying about it."  He also states: "I can't prove it, but I'm sure there was a conversation between John Whitney and Allison [sic] Berry Wilkinson if this was a good idea or some kind of game plan."  No information has been sold to the media, nor have I ever had any conversation with anyone, let alone JOHN WHITNEY, about selling information to the media.  This is as ludicrous as the allegation by Ms. Albert that is detailed *supra,* at paragraph 117 that I am a "co- conspirator," "a leaker of confidential information" and have "misused [my] office."   To be clear: I am none of those things.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of January 2024, in San Rafael, California.

/s/ Alison Berry Wilkinson

ALISON BERRY WILKINSON